UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL LAM,<br><br>    Petitioner,<br><br>    v.<br><br>BARNES GOWER, Warden,<br><br>    Respondent. | No. 2:14-cv-1899 WBS AC<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action proceeds on the petition filed on August 12, 2014, ECF No. 1, which challenges petitioner's 2012 conviction for domestic violence offenses. Respondent has answered, ECF No. 13, and petitioner has filed a traverse, ECF No. 15. Petitioner seeks relief on the sole ground that his rights under the Confrontation Clause were violated by the admission of statements made to a responding police officer by the non-testifying complainant.

## BACKGROUND

### I. Proceedings In the Trial Court

#### A. Pretrial Proceedings

Petitioner was charged in Sacramento County Superior Court with (1) inflicting corporal injury on a cohabitant in violation of Cal. Penal Code § 273.5(a); (2) assault with a deadly

1

weapon in violation of Cal. Penal Code § 245(a)(1); (3) false imprisonment in violation of Cal. Penal Code § 236; and (4) brandishing a firearm in violation of Cal. Penal Code §417(a)(2). CT 21-23 (Amended Felony Complaint).[1]

Both the defense and the prosecution filed motions regarding the admissibility of statements the complaining witness had made to a responding police officer. CT 135-45 (prosecution trial brief and motions in limine); CT 147-58 (defense trial brief and motions in limine). The prosecution was unable to locate the victim for purposes of trial, and sought to present the testimony of the officer regarding her statements. CT 139. The trial court conducted a hearing pursuant to Cal. Evid. Code § 402, at which Officer Daguman testified. RT 19-55.[2] The court ruled that the victim's statements were admissible as spontaneous statements, and that their admission would not violate defendant's rights under the Confrontation Clause because the statements were made in an emergency situation. RT 48-49 (finding no Crawford violation).

Jury trial commenced on April 23, 2012. CT 133.

### B. The Evidence Presented At Trial[3]

#### 1. Prosecution Case

Virgilio Manganaan testified that he was sitting outside a neighbor's open garage on the evening of July 23, 2011, when a young woman came running up asking for help. The petitioner was chasing her in his car. The woman said "Help me, help me" and "Call the cop[s]." Petitioner stopped his car and got out. He appeared angry, and the woman was crying and seemed frightened. She said "He's gonna kill me." The witness did not want to involve himself by calling 911, but did so after the woman repeatedly asked him to. A recording of the 911 call was played for the jury. Mr. Manganaan did not see any violence by petitioner against the woman, or hear any threats.

Officer Rodjard Daguman, of the Elk Grove Police Department, testified that he responded on the evening of July 23 to a call regarding a domestic disturbance on Jenny Lynn

---

[1] "CT" refers to the Clerk's Transcript on Appeal, Lodged Doc. 1.
[2] "RT" refers to the reporter's transcript on Appeal, Lodged Docs. 2 & 3.
[3] This summary is based on the court's independent review of the trial record.

Way. Officers were already on the scene when he arrived, and he was informed that one of the involved parties was being detained. Officer Daguman spoke to Shoua Yang, who was sitting in the open garage of a neighbor. Ms. Yang had been crying and appeared afraid. She had bruises and scratches all over her face, and bruises were also visible on her arms, legs, knees, shoulders and back. Photographs of Ms. Yang's injuries were introduced into evidence. Ms. Yang told Officer Daguman that one bruise had been caused by petitioner hitting her with a metal pole. Another injury was the result of petitioner grabbing her by the bra strap and trying to rip her bra off.

Ms. Yang's account to Officer Daguman was not chronological or cohesive. She was crying, speaking fast, and "all over the place" in recounting what was going on between herself and the petitioner. Officer Daguman thought that she was probably under the influence of methamphetamine, but she responded appropriately to questions and her answers made sense.

Ms. Yang said that she had been in a dating relationship with petitioner for two years, and had lived with him for about a year. The incident that precipitated the 911 call on July 23 began when Yang entered the garage of their house, where petitioner was. Petitioner called Yang over, but she refused to go to him. Petitioner became angry, walked over to Yang, grabbed her by the shoulder and tried to choke her. Ms. Yang broke away and left the house. She returned later, and as she approached the house petitioner came after her. When she saw him she fled in the other direction, to the neighbor's house.

The incident involving her bra strap had occurred three days earlier. On that previous evening petitioner had also hit her over the back of the head and shoulders with two wooden chairs. Ms. Yang reported that on numerous occasions petitioner had used handcuffs to secure her against her will to a car seat or other auto parts that were inside the house. Petitioner had also struck her with a fist on numerous occasions. On the night of July 22, petitioner had hit her with a metal pole. That same night, she was wakened from sleep by petitioner using a 12-inch knife to slash into the bed where she was sleeping. Photographs of the mattress were entered into evidence. Ms. Yang said that petitioner had pointed a gun at her on both the 20th and the 22nd. On an unspecified date or dates, petitioner had told her that if she left the residence or called the

3

police, he would kill her. Ms. Yang feared for her safety. She said that there were guns and a machete in the house.

At some point after initially speaking with Ms. Yang, Officer Daguman went into petitioner's residence and saw car parts including bumpers and bucket seats in the family room. Handcuffs were found in the bedroom that petitioner shared with Yang. Officers also found a metal pole, firearms, a knife, and a machete.

Officer Brandon Holly testified that when he arrived at the Jenny Lynn Way address, petitioner was being detained by other officers on the sidewalk outside the house. Petitioner was placed into the patrol vehicle immediately upon his arrival. Officer Holly made contact with petitioner, and Officer Daguman talked to Shoua Yang. It was Officer Holly's impression that Ms. Yang was possibly under the influence of methamphetamine and that petitioner, who was calm, was possibly "coming down." Ms. Yang gave permission for Officer Holly to search the residence. In various locations within the house he found two handguns, ammunition, a "samurai style knife," a machete, handcuffs, and a metal pole. Ms. Yang said that petitioner had hit her on the back and shoulders with the metal pole. She identified one of the handguns as the gun petitioner had pointed at her.

Officer Holly questioned petitioner as he sat in the back of the patrol vehicle. After waiving his Miranda rights, petitioner said that he and Ms. Yang had lived together at the house for seven or eight months, and both used methamphetamine on a regular basis. Petitioner said that Ms. Yang had videotaped him and lied to him, and that he had responded on numerous occasions by hitting, slapping, punching and handcuffing her. He admitted having pointed a gun at her many times. He stated repeatedly that he loved Ms. Yang and had not been trying her hurt her on these occasions, but was just trying to get her to talk to him. Ms. Yang never fought back or physically assaulted him. Petitioner said that on the previous night he had hit Ms. Yang, stabbed the bed next to where she was lying, and handcuffed her to a chair against her will. He said that he was not trying to hurt her, but was trying to scare her so that she would talk to him. He had pointed a loaded gun at her on the previous night, but did not recall whether he made verbal threats. A week earlier he had threatened to kill her if she ever left him. He denied

4

striking her with the metal pole. He stated that on the day of July 23 there had been no altercation, but that Ms. Yang had run out of the house and he had tried to get her to come back.

Ms. Yang did not testify.

### 2. Defense Case

Petitioner's father, Bien Lam, testified that in July of 2011 he was living part-time with petitioner and Ms. Yang in the house on Jenny Lynn Way. He never witnessed any violence between petitioner and Ms. Yang, or saw him restrain her with handcuffs. He never heard any threats, and Ms. Yang never told him that she was being hurt. Sometimes the elder Mr. Lam would find Ms. Yang crying, but she would not tell him why. Sometimes she talked out loud to herself as if she was talking to another person, but no one was there.

## C. Outcome

On April 27, 2012, the jury found petitioner guilty on all counts. CT 234-35. Judgment and sentence were pronounced on August 8, 2012. CT 274. Petitioner was sentenced to a prison term of five years and four months. Id.

## II. Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on December 10, 2013. Lodged Doc. 7. The California Supreme Court denied review on April 9, 2014. Lodged Doc. 11. The instant federal petition, dated April 28, 2014, was docketed on August 12, 2014. ECF No. 1.

## STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

5

1  State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 131 S. Ct. 770, 785 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. at 784-785 (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d)(1) is limited to the record that was before the state court. Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 1399. Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the

////

6

state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).

Relief is also available under AEDPA where the state court predicated its adjudication of a claim on an unreasonable factual determination. § 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court. Id. An unreasonable determination of facts exists where, among other circumstances, the state court made its findings according to a flawed process -- for example, under an incorrect legal standard, or where necessary findings were not made at all, or where the state court failed to consider and weigh relevant evidence that was properly presented to it, or where petitioner was denied the opportunity to present evidence. See Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir.), cert. denied, 543 U.S. 1038 (2004). A factual conclusion can also be substantively unreasonable where it is not fairly supported by the evidence presented in the state proceeding. See, e.g., Wiggins, 539 U.S. at 528 (state court's "clear factual error" regarding contents of social service records constituted unreasonable determination of fact).

To prevail, a habeas petitioner must establish the applicability of one of the section 2254(d) exceptions and must also affirmatively establish the constitutional invalidity of his custody under pre-AEDPA standards. Frantz, 533 F.3d at 735-36. There is no single prescribed order in which these two inquiries must be conducted. Id. at 736-37.

## DISCUSSION

I.  Petitioner's Allegations and Pertinent State Court Record

Petitioner's sole claim is that his rights under the Confrontation Clause were violated by admission of Shoua Yang's out-of-court statements to Officer Daguman. Officer Daguman's trial testimony about those statements is summarized above and need not be repeated here.

Prior to trial, the superior court conducted a hearing pursuant to Cal. Evid. Code § 402 and ruled that the statements were admissible. At the hearing, Officer Daguman testified in pertinent part as follows:[4]

---

[4] RT 19-42.

On the evening of July 23, 2011, Officer Daguman responded to a call involving a domestic dispute. When he arrived at the scene, other officers were already there. Officer Daguman contacted Ms. Yang, who was in the open garage of a neighbor's home. She was "distraught," "crying," "shocked," and appeared fearful; this demeanor did not change during the course of the ensuing conversation.[5] Ms. Yang said that her boyfriend "had just recently choked her and was going after her." RT 20. The choking had happened just before Officer Daguman got there. Ms. Yang explained that she had broken away from the chokehold and left the residence, but when she had tried to return petitioner chased her. Ms. Yang was crying and upset throughout her explanation of what had happened. Officer Daguman "just asked her what was going on, and she indicated that, that she was being choked by Mr. Lam and that the abuse – she had been abused in the past, and it started around July 4th of 2011." RT 22.

During this conversation Officer Daguman was aware that petitioner had been detained in a patrol car, but he did not relay that information to Ms. Yang.

As soon as Officer Daguman contacted Ms. Yang, he noticed multiple visible injuries on her body. She said that the injuries on her shoulders had been caused by petitioner grabbing her by her bra strap and hitting her with a metal pole. The assault with the metal pole had happened the day before. Three days earlier, petitioner had pointed a gun at her head. The gun was in the house where Ms. Yang lived with petitioner.

Based on this information, Officer Daguman obtained Ms. Yang's consent to search for firearms, and he and other officers went into the house. They located a gun, a 12-inch knife and a pair of handcuffs

Officer Daguman spoke with Ms. Yang a second time after the search. This conversation happened twenty to thirty minutes after the first one, in the driveway of Yang's and petitioner's residence. Ms. Yang had "calmed down a little bit" but was still crying. RT 27. Officer Daguman spoke to her in order "to clarify her story." RT 27. He asked follow-up questions

---

[5] Although Officer Daguman suspected Yang was under the influence of methamphetamine, he thought based on experience that her distress and rapid speech were not solely attributable to drugs. RT 28.

8

occasioned by the search, including whether there were additional weapons in the house. RT 28. Ms. Yang then identified the location of the metal pole and machete. She reported that petitioner had used the handcuffs to secure her to vehicle parts, and the 12-inch knife to slash the mattress while she slept. Ms. Yang also said at some point that petitioner had threatened to kill her if she called the cops or left the residence.

II.   The Clearly Established Federal Law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him." The Confrontation Clause prohibits the admission of testimonial out-of-court statements by non-testifying individuals. Crawford v. Washington, 541 U.S. 36 (2004). Not all hearsay implicates the core concerns of the Confrontation Clause; the dispositive question is whether the statement is "testimonial." Crawford, 541 U.S. at 51. A statement is nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Davis v. Washington, 547 U.S. 813, 822 (2006). A statement is testimonial, in contrast, when "the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id.; see also Hammon v. Indiana, 547 U.S. 813, 829-32 (2006) (decided together with Davis, and reaching opposite result on contrasting facts).

As the Supreme Court clarified in Michigan v. Bryant, 562 U.S. 344, 370 (2011):

> [W]hen a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation.

Confrontation Clause violations are subject to harmless error analysis under Chapman v. California, 386 U.S. 18 (1967). Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

9

III. The State Court's Ruling

This claim was raised on direct appeal. Because the California Supreme Court denied discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned decision on the merits and is the subject of habeas review in this court. See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

The Court of Appeal identified the applicable legal principles as those set forth in Crawford, Davis, and Hammon. Lodged Doc. 7 at 6-7. It then ruled in pertinent part as follows:

> Defendant contends all of the victim's statements to Officer Daguman were testimonial and should not have been admitted absent an opportunity to confront and cross-examine her because "the statements were not necessary to respond to a currently occurring emergency," inasmuch as they related to events that had already occurred, and were made while defendant had been detained.
>
> To be sure, some factors suggest statements made during both the first and second conversations between Officer Daguman and the victim could be viewed as testimonial: the threats, assault and injury reported by the victim had already occurred and defendant was at least temporarily detained in a patrol car at the scene. But objectively viewing the totality of the circumstances, we conclude the primary purpose of Officer Daguman's first conversation with the victim while she was inside the neighbor's garage was to "deal with a contemporaneous emergency, such as assessing the situation [or] dealing with threats ...." (*People v. Romero* (2008) 44 Cal.4th 386, 422; *Cage, supra*, 40 Cal.4th at p. 984.) The victim ran crying to her neighbor that defendant was "gonna kill" her; the neighbor saw defendant in anger, and he twice called the police. Responding to the 911 calls, Daguman confronted an obviously distraught woman who was crying and afraid, had begged her neighbor to call police, and was hiding inside the neighbor's garage. (cf. *Banos, supra*, 178 Cal.App.4th at p. 497.) The victim had bruises and scratches all over; she was shocked, confused, and fearful. When asked what "was going on" with defendant, the victim related that she had been suffering fairly continuous abuse at defendant's hands for three days and he had pointed a gun at her, handcuffed her against her will, tried to choke her just that morning, and threatened to kill her if she left the house or called the police. (See *Saracoglu, supra*, 152 Cal.App.4th at p. 1597 [one of the chief reasons the *Saracoglu* court found the victim's statements admissible in that case is because the defendant had threatened to kill the victim if she went to the police, meaning the "emergency was ongoing"].) In light of the victim's demeanor and visible injuries and defendant's threats, Daguman--- as the officer responding to a 911 call of a possibly violent domestic dispute in progress---sought to "assess the situation, the threat to [his] own safety, and possible danger to the potential victim" and "[s]uch exigencies may *often* mean that 'initial inquiries' produce

nontestimonial statements." (*Davis, supra*, 547 U.S. at p. 832 [165 L.Ed.2d at p. 243].) The victim's statements about how she was injured and threatened, and what weapons remained at defendant's disposal represented nontestimonial "cr[ies] for help" and "the provision of information enabling officers immediately to end a threatening situation." (Cf. *id*. at pp. 830, 832 [165 L.Ed.2d at pp. 242, 243].)

In our view, however, circumstances changed somewhat during the 20 or 30 minutes that elapsed between Officer Daguman's first and second conversations with the victim. The victim was calmer during her second conversation with Daguman, which occurred while the victim stood outside the house she shared with defendant, and she likely then could have seen that defendant was inside the patrol car. As the Supreme Court recognized in *Davis*, the dynamics present in any investigative situation can change and "a conversation which begins as an interrogation to determine the need for emergency assistance ... [may] 'evolve into testimonial statements,' once that purpose has been achieved." (*Davis, supra*, 547 U.S. at p. 828 [165 L.Ed.2d at p. 241]).) Daguman testified that his second conversation with the victim occurred *after* officers searched the house for weapons with her consent and found a gun, handcuffs and the knife defendant had used to stab the bed where the victim lay. At that point, Daguman sought to have the victim "clarify her story" but he did not indicate what points required "clarification" or what, if any, clarification the victim may have given: Daguman testified only that he asked her about the presence of additional weapons in the house so he might secure them, and she told him that the metal pole and the machete could be found in an upstairs closet. At that point, the initial emergency had passed (cf. *Hammon, supra*, 547 U.S. at pp. 820-821, 830 [165 L.Ed.2d at pp. 236, 242)). The victim's statements during her second conversation with Daguman were not "a cry for help nor the provision of information enabling officers immediately to end a threatening situation, [therefore] the fact that they were given at an alleged crime scene and were 'initial inquiries'" did not render them nontestimonial. [fn.4] (See *Davis, supra*, 547 U.S. at p. 832 [165 L.Ed.2d at p. 243].) Because defendant had no opportunity to cross-examine the victim about her statements to Daguman during their second conversation, Daguman should not have been permitted to testify about them at trials. [fn. 5] (Cf. Davis, at p. 821 [165 L.Ed.2d at pp. 236-237].)

[fn.4: Officer Daguman's notes of his conversation with the victim do not distinguish what she said during the first and second conversations and defendant makes no attempt to distinguish between statements made over time by the victim to Daguman. Rather, he declares all of them testimonial and argues the court erred in admitting all of them. As stated above, we reject that analysis: The evidence showed Daguman's primary purpose in his first conversation with the victim was to render assistance and determine "what was going on" between the victim and defendant. That the victim's response was "all over the place" and included some information about what *had* happened rather than "what was

11

> happening" does not render her initial conversation with Daguman testimonial.]
>
> [fn.5: Because we find that the victim's statements to Officer Daguman during their first conversation were nontestimonial and thus properly admitted through his testimony at trial, we need not address defendant's claim in his brief and during oral argument that, if all of the victim's statements are excluded, there remains no evidence to establish the corpus delicti of the counts underlying his convictions for false imprisonment, brandishing a firearm, and simple assault.]
>
> We nonetheless conclude that any error resulting from allowing Officer Daguman to testify about the victim's statements to him during his second conversation was harmless beyond a reasonable doubt. (Cf. *Cage, supra*, 40 Cal.4th at pp. 991-994 [finding erroneous admission of testimonial hearsay harmless beyond a reasonable doubt].) The victim's second conversation with Officer Daguman on the sidewalk outside her house appears to have concerned the location inside the house of the metal pole and the machete. The jurors had already heard about defendant's having hit the victim with the metal pole and his fists through the victim's nontestimonial statements to Daguman during their first conversation. And jurors learned about the other events that formed the basis of the charges from defendant's own admissions to police: Defendant admitted hitting the victim, slapping her, punching her, handcuffing her against her will, pointing a loaded handgun at her as they argued, stabbing the bed while she lay in it to scare her, and threatening to kill her. Defendant's version of events differed chiefly from the victim's in his claim that he did not do these things because he wanted to hurt her, but because he was "trying to get her to speak to him" or out of possible jealousy.
>
> Accordingly, we conclude any error attributable to the admission of testimonial statements by the victim to Officer Daguman during their second conversation was harmless beyond a reasonable doubt.

Lodged Doc. 7 at 9-13.[6]

    IV.    <u>Review Under 28 U.S.C. § 2254</u>

        A. <u>Deference to the State Court's Factual Determinations</u>

           1. <u>The Presumption of Correctness Under § 2254(e)(1)</u>

In his Reply, petitioner contests the accuracy and completeness of the California Court of Appeal's statement of the facts. See ECF No. 15 at 8-11. The state appellate court's recitation of

---

[6] Dissenting in part, Justice Hull would have held that the statements elicited in the second conversation were non-testimonial because obtained for the purpose of locating and securing weapons in order to neutralize any remaining danger. Lodged Doc. 7, separately paginated opinion following majority opinion.

the facts is presumed correct unless petitioner rebuts that presumption with clear and convincing evidence. Slovik v. Yates, 556 F.3d 747, 749 n. 1 (9th Cir. 2009); 28 U.S.C. § 2254(e)(1).

Petitioner disputes four factual assertions in the California Court of Appeal opinion. First, petitioner disputes the assertion that Officer Daguman did not tell Ms. Yang that petitioner was already detained when he initially questioned her in the neighbor's garage. Petitioner argues in this regard that "the record is silent as to whether the officer did or did not tell the victim that petitioner had been detained"; that "common sense indicates that he would have" done so; and that because the garage door was open, Ms. Yang could have seen petitioner in the patrol car. ECF No. 15 at 9-10. Second, based on the same reasoning, petitioner disputes that the circumstances of Officer Daguman's first and second conversations with Ms. Yang were different from each other, specifically in that Yang was able to observe petitioner's detention only during the second conversation which took place in front of petitioner's house. Id. at 10. Third, petitioner challenges the state court's underlying distinction between a first conversation and a second conversation, on grounds that Officer Daguman testified he could not specify which statements were made during which conversation. Id. at 10-11. Fourth, petitioner objects to the characterization of Yang's initial demeanor as "distraught," noting that Officer Daguman had testified he believed her demeanor was the result of drug intoxication. Id. at 11.

Petitioner's contentions are, in essence, arguments about the correct inferences to be drawn from the evidence or the correct conclusions to be drawn from conflicting evidence. On habeas review, even without reference to AEDPA's heightened deference requirements, it is axiomatic that all permissible factual disputes and inferences must be resolved in favor of the prosecution. See Juan H. v. Allen, 408 F.3d 1262, 1266 n.1 (9th Cir. 2005) (citing Jackson v. Virginia, 443 U.S. 307, 326 (1979)). Although petitioner makes legitimate arguments about the conclusions which are best supported by the evidence, neither his arguments nor the portions of the record on which he relies constitute "clear and convincing evidence" sufficient to rebut the presumption of correctness. Nor does petitioner adduce or proffer any extra-record evidence which might rebut the presumption. Accordingly, this court must presume the correctness of the facts as recited by the California Court of Appeals, subject to challenge under § 2254(d)(2).

## 2. Objective Reasonableness Under § 2254(d)(2)

Petitioner contends in conclusory fashion that the decision of the California Court of Appeal was based on an unreasonable determination of facts in light of the record evidence. ECF No.15 at 12. The state court's analysis of the Confrontation Clause issue is predicated on its finding that there were two distinct conversations between Officer Daguman and Ms. Yang, the first of which took place under circumstances which rendered Yang's statements non-testimonial because made in response to questioning regarding a contemporaneous emergency. See supra at 10-12. As previously noted, petitioner denies that there were in fact two distinct conversations, and that the circumstances of Officer Daguman' inquiries changed in any way material to the Confrontation Clause analysis.

For the same reasons that petitioner's challenge to the state court's factual findings does not rebut the presumption of correctness under § 2254(e)(1), it does not establish objective unreasonableness under § 2254(d)(2). Petitioner argues why different inferences and conclusions should have been drawn from the evidence, but has not explained how or why the Court of Appeal's statements of fact are "objectively unreasonable" within the meaning of AEDPA. Petitioner makes no showing that the state court made its factual findings according to an incorrect legal standard, or failed to make necessary findings, or that the state court failed to consider relevant evidence, or denied petitioner an opportunity to present evidence. See Taylor, 366 F.3d at 999-1000 (discussing circumstances that might demonstrate an unreasonable determination of facts). Nor does petitioner identify any material statements of fact that are directly and unequivocally contradicted by the record. See Wiggins, 539 U.S. at 528 (finding unreasonable factual determination where state court misrepresented contents of social services records).

Officer Daguman's trial testimony does not clearly lay out the chronology of his interactions with Yang. At trial, the officer did not distinguish between two separate conversations, although his testimony did indicate that the search of petitioner's residence followed some of Yang's statements to him and preceded others. See e.g., RT 120. However, the trial court's ruling on the admissibility of Yang's out-of-court statements, which the Court of

Appeal reviewed, was based on testimony adduced at a pretrial hearing pursuant to Cal. Evid. Code § 402. RT 19-55. At the § 402 hearing, Officer Daguman expressly testified that there had been two conversations: an initial conversation upon his arrival at the neighbor's garage, and a second conversation twenty to thirty minutes later, in front of the house where petitioner and Yang lived. RT 20, 24-25. The initial search of the residence took place in between the two conversations, and was based on Yang's consent. RT 25.

Officer Daguman separately described Yang's demeanor during each of the two conversations. RT 20, 25. During the first interaction she was "distraught," "crying," "shocked," and fearful; her demeanor did not change during the course of that conversation. RT 20. She was calmer during the second conversation, though still crying. RT 27. Although Officer Daguman suspected Yang was under the influence of methamphetamine, he thought based on experience that her distress and rapid speech were not solely attributable to drugs. RT 28. Officer Daguman initiated the first conversation by asking "what was going on," to which Yang responded by describing the immediately preceding events (the choking incident and petitioner's pursuit of her) as well as prior recent events including the metal pole and bra strap incidents and petitioner having put a gun to her head. RT 22-24. The second conversation involved follow-up questions occasioned by the search, including whether there were additional weapons in the house. RT 28. Officer Daguman specified that he spoke with Ms. Yang the second time after coming out of the house, in order "to clarify her story." RT 27.

The evidence presented at the § 402 proceeding provides a reasonable basis for the state court's finding that there were two separate conversations, and for the distinctions it identified between the statements made by Yang before and after the search of the house. Accordingly, the state court did not base its resolution of the Confrontation Clause claim on an objectively unreasonable determination of facts, and § 2254(d)(2) does not provide an avenue for relief.

    B.  Reasonableness of the State Court's Legal Determinations

        1.  The State Court's Conclusion That The First Statement Was Non-testimonial

            a.  The "Contrary To" Clause of § 2254(d)(1)

The California Court of Appeal held that the statements Ms. Yang made during her first

conversation with Officer Daguman were non-testimonial, and therefore not admitted in violation of petitioner's confrontation rights. Petitioner argues first that this legal conclusion is "contrary to" the holding in Hammon v. Indiana, supra, and therefore does not bar federal habeas relief. See § 2254(d)(1). A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the U.S. Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. Bell v. Cone, 535 U.S. 685, 694 (2002). Petitioner contends that the facts of his case are "materially indistinguishable" from Hammon, and that the state court opinion is thus "contrary to" that authority.

In Hammon, the Supreme Court held that a statement given by a domestic violence victim to police at the scene of the crime was testimonial for Confrontation Clause purposes. Petitioner emphasizes that in Hammon, like the instant case, the statement at issue was given in response to police questioning after the alleged assault was over and while the alleged victim was safe and under police protection. Other material facts, however, distinguish Hammon and this case. In Hammon, police responded to a report of a domestic dispute and contacted a woman who insisted that everything was fine. 547 U.S. at 829-30. The victim was not seeking aid, and her eventual narrative of past events "was delivered at some remove in time from the danger she described." Id. at 832. The officer had her sign an affidavit in order to preserve her statements for evidentiary purposes. Id. at 820. These circumstances stand in contrast to the instant case, in which police arrived to find Ms. Yang in overt distress, expressing ongoing fear for her life, and actively seeking aid. Her explanation of what had happened, including events immediately prior to the officers' arrival and in the preceding days, was given in explanation of the current situation. These distinctions compel the conclusion that the state court's resolution of the Confrontation Clause issue was not "contrary to" Harmon within the meaning if § 2254(d)(1).

      b.   The "Unreasonable Application " Clause of § 2254(d)(1)

Petitioner argues further that the state court unreasonably applied Davis and Hammon. For the reasons that follow, this court disagrees.

In the companion cases of Davis and Hammon, 547 U.S. 813, the Supreme Court

16

identified several factors that distinguish testimonial from non-testimonial statements; it declined, however, to establish any bright-line test. Davis involved admission of a 911 call, which the Court found non-testimonial because made for the purpose of securing emergency assistance. Id. at 827. The declarant was reporting events as they were actually happening, rather than describing past events. Id. The information relayed was "necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past." Id. And the statements were made informally, over the phone, rather than in response to structured questioning at a police station as in Crawford v. Washington, supra. Id. The court concluded from these circumstances that "the primary purpose" of questions asked by the police dispatcher "was to enable police assistance to meet an ongoing emergency" rather than to develop evidence of completed crimes. Id. at 828.

In Hammon, as discussed above, the Supreme Court found the statements of a victim to police, in response to questioning about past events and in the absence of any apparent emergency or ongoing threat, to be testimonial. The officer in Hammon acknowledged that he was investigating past acts and developing evidence. Id. at 829, 830. The circumstances that weighed most heavily in the Court's assessment were that the victim's statements were not a cry for help, nor the provision of information enabling officers to end a threatening situation; in that context, it was immaterial that that the statements were given at the alleged crime scene and in response to "initial inquiries" rather than subsequent investigation. Id. at 832. However, the Court was also careful to note that under other circumstances, responses to initial inquiries at the scene of a crime *could* be non-testimonial. Id.[7] In other words, victim statements to officers at the scene, rather

---

[7] "Although we necessarily reject the Indiana Supreme Court's implication that virtually any 'initial inquiries' at the crime scene will not be testimonial […] we do not hold the opposite -- that *no* questions at the scene will yield nontestimonial answers. We have already observed of domestic disputes that '[o]fficers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.' Hiibel, 542 U.S., at 186 […]. Such exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements. But in cases like this one, where Amy's statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial. Cf. Crawford, supra, at 52, n. […]." Hammon, 547 U.S. at 832.

17

than on the phone to a 911 dispatcher as in Davis, may in light of the circumstances as a whole be non-testimonial, particularly if they involve a cry for help or provide information that enables officers to assess or end a threatening situation.

The facts of the present case fall between the poles of Davis and Hammon. The statements were given at the scene to an officer and addressed past events, as in Hammon, but were made by a person seeking emergency assistance as in Davis. Petitioner argues that the emergency had passed by the time that Officer Daguman spoke to Ms. Yang, because no assault was in progress and petitioner was already detained in a patrol car. This is a perfectly valid argument, and another court might have concluded on that basis that Ms. Yang's statements were testimonial. This does not mean, however, that it was objectively unreasonable of the state court here to conclude otherwise.

In distinguishing testimonial from non-testimonial statements, the most important factor is the "primary purpose" of the interrogation. Davis, 547 U.S. at 822. That purpose must be determined by evaluation of all the circumstances, including the actions and statements of all parties. Bryant, 562 U.S. at 370-71. The Supreme Court has distinguished between statements elicited by an officer seeking to determine (as in Davis) "what is happening" and those elicited to determine (as in Hammon) "what had happened." Davis, 547 at 830. Here, the evidence at the § 402 hearing was that Officer Daguman had asked Ms. Yang "what was going on." RT 22. That is an open-ended question about "what is happening." Although some of Ms. Yang's subsequent statements involved past events, the record supports an inference that those statements were volunteered in order to provide context for the immediate situation and explain Ms. Yang's level of fear and distress, as well as the source of her injuries. Officer Daguman testified that Yang did not report events in chronological order, but responded to "what['s …] going on" with a jumble of things that had just happened and things that had happened a few days previously. It was not objectively unreasonable of the state court to conclude that Officer Daguman's primary purpose was to figure out what was then happening and deal with a contemporaneous emergency. Despite the fact that petitioner was already detained, responding officers could not know the nature or extent of the threat to Ms. Yang or to public safety until after they figured out "what was going

on." That is precisely what Officer Daguman did.

Petitioner is correct that the strongest similarities between his own case and Hammon are that the altercation was no longer in progress at the time of the statements, and that the declarant was separated (and thus protected) from her alleged assailant. But the U.S. Supreme Court has never said that the distinction between testimonial and non-testimonial statements is determined by a stop-watch, or that any particular factor is dispositive. In light of the totality of circumstances presented here, the state court's resolution of petitioner's confrontation claim is debatable, but not objectively unreasonable. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) (habeas relief precluded where "fairminded jurists could disagree" on correctness of state court's decision).

For these reasons, California Court of Appeal did not unreasonably apply clearly established federal law in concluding that the statements made during Ms. Yang's first conversation with Officer Daguman were non-testimonial.

2. The State Court's Conclusion That Admission Of The Second, Testimonial Statement Was Harmless

The state appellate court found that the trial judge had erred in admitting evidence of the second conversation between Officer Daguman and Ms. Yang, because those statements were testimonial within the meaning of Davis and Hammon.[8] The appellate court held, however, that the error was harmless beyond a reasonable doubt. On habeas review, the question becomes whether the state court's harmless-error determination was objectively unreasonable. Frye v. Pliler, 551 U.S. 112, 119 (2007).[9]

The California Court of Appeal applied the correct "harmless beyond a reasonable doubt

---

[8] This conclusion was based on the passage of time and containment of the initial threat, Yang's somewhat calmer demeanor, and the fact that Office Daguman was questioning Yang further in order to "clarify her story." These circumstances, in the state court's view, moved the conversation over the line from emergency response into investigative territory. That conclusion is not unreasonable.

[9] Petitioner does not expressly challenge the harmless error finding under § 2254(d)(1). Rather, he argues prejudice from admission of all the Yang statements, taken as a whole. ECF No. 15 at 24-28. The court nonetheless addresses the issue because petitioner's pleadings, liberally construed, could be read to raise the issue.

19

standard," which governs federal constitutional errors. See Chapman v. California, 386 U.S. 18, 24 (1967). The state court based its harmless error finding on the observation that the second conversation primarily involved the location in the house of the metal pole and machete; jurors learned independently from Yang's earlier non-testimonial statements that petitioner had hit her with the pole and with his fists. Moreover, petitioner "admitted hitting the victim, slapping her, punching her, handcuffing her against her will, pointing a loaded handgun at her as they argued, stabbing the bed while she lay in it to scare her, and threatening to kill her." Lodged Doc. 7 at 12. It was not objectively unreasonable of the state court to conclude that the error was harmless in light of defendant's admissions to police and the information contained in the non-testimonial Yang statements.

## CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. See 28 U.S.C. § 2253(c)(2). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 5, 2017

*/s/ Allison Claire*
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

20